**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHEN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **IRIS RIVERA,** | : | Case No. 1:13-CV-00602 |
| Plaintiff, | : | |
| vs. | : | |
| **CAROLYN W. COLVIN,** | : | |
| **COMMISSIONER OF SOCIAL SECURITY** | | **MAGISTRATE'S REPORT AND** |
| | : | **RECOMMENDATION** |
| Defendant. | | |

**I. INTRODUCTION.**

Pursuant to 72.2(b)(1) of the UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF OHIO LOCAL CIVIL RULES, this case was automatically referred to the undersigned Magistrate Judge for a report and recommendation.  Plaintiff seeks judicial review of Defendant's final determination denying her claim for Disability Insurance Benefits (DIB) under Title II the Social Security Act (Act).  Pending are the Briefs on the Merits filed by the parties (Docket Nos. 9 & 10).  For the reasons set forth below, the Magistrate recommends that the Court affirm the Commissioner's decision.

**II. PROCEDURAL BACKGROUND.**

On April 11, 2008, Plaintiff filed an application for DIB, alleging that she became unable to work because of her disabling condition on February 9, 2007 (Docket No. 8, pp. 69-71 of 548). The application was denied initially and upon reconsideration (Docket No. 8, pp. 54-57; 59-61 of 548).  Plaintiff's request for hearing was granted and on July 20, 2010, Plaintiff, represented by

counsel, Vocational Expert (VE) Dr. Robert Mosley, and Interpreter Rosario Cambria, appeared before Administrative Law Judge (ALJ) Traci M. Hixon (Docket No. 8, pp. 30; 32 of 548). On June 8, 2011, the ALJ issued an unfavorable decision, finding that Plaintiff had not been under a disability as defined in the Act from the date her impairment began through the date of the ALJ's decision (Docket No. 8, pp. 13-25 of 548). The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied review of the ALJ's decision on January 25, 2013 (Docket No. 8, pp. 5-7 of 548). Plaintiff timely filed a Complaint in this Court seeking judicial review of the Commissioner's decision denying benefits (Docket No. 1).

### III. FACTUAL BACKGROUND.

At the administrative hearing convened in Cleveland, Ohio, Plaintiff and the VE testified. A summary of their testimony follows.

### A.    PLAINTIFF'S TESTIMONY.

Plaintiff, a high school graduate, was married with three children, ages 23, 20 and 15. Two of her children lived with her (Docket No. 8, p. 34 of 548). Plaintiff claimed that she spoke, wrote and understood "a little bit of English" and that she could drive (Docket No. 8, pp. 34-35 of 548). A former smoker, Plaintiff did not consume alcoholic beverages or use illegal substances (Docket No. 8, p. 35 of 548).

At U. S. Cotton, a manufacturer of cotton swabs, balls and puffs for healthcare, cosmetic, pharmaceutical and industrial use, Plaintiff operated a machine that manufactured Q-tips®. She monitored the intake of cotton into the machine. Subsequently from 2005 to 2007, Plaintiff was employed at Team Wendy also known as Coit Road Incubator, a company that manufactured protective cushioning inserts used to reinforce army helmets. There, Plaintiff was responsible for

2

making job assignments (Docket No. 8, pp. 38; 39 of 548).

Plaintiff testified that she could not work because of tremendous pain in her lower back and depression.  Since the pain radiated from her back to her legs, she occasionally lost her balance. With pain and anti-inflammatory medications, the pain dissipated for up to 1½ hours before returning.  The medication, however, caused euphoria.  Plaintiff took three medications to regulate her depression.  She noticed some improvement when she took the drugs (Docket No. 8, pp. 39-40; 41 of 548).

Even with her impairments, Plaintiff estimated that she could not lift a gallon of milk (8.6 pounds), she could stand, walk or sit up to 15 minutes before feeling uncomfortable.  Plaintiff was right-hand dominant and she had difficulty reaching forward and over her head.  Plaintiff also claimed that she had trouble going up and down stairs, bending, kneeling and crawling (Docket No. 8, pp. 41, 42 of 548).

Plaintiff's mother resided with her and her mother cooked all of the meals.  Plaintiff occasionally washed a "couple of dishes" and she did not shop alone.  Plaintiff had no difficulty with her personal needs, grooming or hygiene.  Plaintiff enjoyed watching television but not  reading. She did not belong to any clubs or groups but she occasionally  socialized with family members (Docket No. 8, pp. 35-36 of 548).

After arising at 10:00 A.M., Plaintiff ate,  took her medications and returned to bed.  Later, she watched television, played computer games and took a nap.  Plaintiff rarely "ran errands" without the assistance of her husband.  Plaintiff retired between 11:00. and 12:00 P.M. nightly and she had periods of sleep intermingled with periods of wakefulness (Docket No. 8, pp. 35; 37; 38 of 548).

### B.    THE VE'S TESTIMONY.

The VE, a certified rehabilitation counselor, appeared for the purpose of giving impartial opinion testimony. Plaintiff's counsel did not object to his professional qualifications or his service as an expert in this matter. The VE affirmed that his testimony was consistent with the DICTIONARY OF OCCUPATIONAL TITLES (DOT), a universal classification of occupational definitions and how the occupations are performed (Docket No. 11, p. 51 of 764; www.occupationalinfo.org).

Consistent with the descriptions that Plaintiff gave, the VE categorized Plaintiff's past relevant work as a lead person, assembly worker and machine tending. The lead person and assembly worker were classified as light, unskilled to lower level semi-skilled work. The machine tending job was classified as light, unskilled work. All three jobs had a specific vocational preparation of two. In other words, the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation, was anything beyond a short demonstration up to and including one month. The ALJ did not identify any skills acquired from these jobs that would transfer to other industries (Docket No. 8, p. 44 of 548; www.onetonline.org).

The ALJ posed the first hypothetical to the VE:

> Assume we had a person of the same age, education and employment background as Ms. Rivera, and this person was able to -we'll start off saying this person was able to lift and carry 20 pounds occasionally and 10 pounds frequently. This person could stand and walk for six hours and sit for six hours, but we want them to have a sit/stand option every half hour. This person could occasionally climb stairs and ramps, bend, and balance, stoop. This person does not kneel or crawl. This person can frequently reach in front, occasionally overhead. This person can handle, finger, and feel. This person is capable of performing single, routine tasks with simple, short instructions, simple work-related decisions with few workplace changes and we're going to limit the person to minimal contact with the public. Would this person be able to perform Ms. Rivera's past work?

4

The VE opined that this hypothetical person could not perform Plaintiff's past relevant work; however, the hypothetical worker could perform the following sedentary, unskilled positions identified in the DOT:

| Job/DOT | Locally | State of Ohio | Nationally |
|---|---|---|---|
| Final assembler<br>DOT 713.687-018 | 1,700+ | 6,000+ | 280,000+ |
| Inspector, tester & Examiner<br>• DOT 713.687–026<br>• DOT 726.684-110<br>• DOT 726.684-050 | 2,000+ | 10,000+ | 400,000+ |
| Surveillance system monitor<br>DOT 379.367-010 | 600+ | 1,400+ | 85,000+ |

Since these jobs were performed at the sedentary level, the hypothetical person would not be required to lift more than 10 pounds occasionally and stand and walk two hours out of eight and sit two hours out of eight.  If the hypothetical person were going to miss work frequently or three times per month, such hypothetical person would not be able to perform or retain the jobs identified above (Docket No. 8, pp. 45-48 of 548).

## IV.  MEDICAL EVIDENCE.

Under 20 C. F. R. § 404.1512(a), Plaintiff must prove that she is disabled.  This means that she must furnish medical and other evidence that can be used to reach conclusions about her medical impairments, and if material, its effect on her ability to work on a sustained basis.  The following is a summary of the medical evidence received from the professional sources that the ALJ used to reach conclusions about Plaintiff's medical impairments.

### A.  EVIDENCE AVAILABLE TO THE ALJ.

On January 19, 2007, Plaintiff underwent a magnetic resonance imaging of the spine. The results showed modest annular protrusion at the L5 level without associated canal stenosis and

5

modest bilateral nerve root impingement at the L5 level more notably on the right than on the left (Docket No. 8, p. 189 of 548).

Plaintiff presented to the St. Vincent Charity Occupational Medicine for an initial evaluation on February 6, 2007. Plaintiff explained that she sustained a back injury while working on June 2, 2006. Dr. Catherine Watkins Campbell, M.D., diagnosed Plaintiff with lumbar sprain/strain and ordered magnetic resonance imaging. She also prescribed Vicodin and advised Plaintiff to refrain from driving or working while taking this medication (Docket No. 8, pp. 195-196 of 548).

Plaintiff's last day at work was scheduled on February 10, 2007; however, she had taken off the past two days due to intensified back pain. On February 13, 2007, Plaintiff presented to the St. Vincent Charity Occupational Medicine for follow-up of her low back injury pending approval for a neurosurgical referral and consultation. Dr. Campbell prescribed a medication usually for short-term moderation of pain. In addition she authorized Plaintiff to undergo physical therapy three times weekly for three weeks (Docket No. 8, pp. 178-179; 200 of 548).

On February 13, 2007, Dr. Campbell completed a PHYSICIAN'S REPORT OF WORK ACTIVITY for the Bureau of Worker Compensation (BWC). She assessed Plaintiff's work and non work capabilities as follows:

- Plaintiff could occasionally (1-33%) lift up to ten pounds per hour during an eight-hour workday.
- Plaintiff could occasionally (1-33%) stand/walk for ten minutes during an eight-hour work day.
- Plaintiff could occasionally (1-33%) sit up to twenty minutes during an eight-hour work day.
- Plaintiff could not lift more than 11 pounds; she could not bend; twist/turn; reach below the knee; push/pull; squat/kneel; or lift above her shoulders (Docket No. 8, p. 229 of 548).

On February 16, 2007, Plaintiff presented to the St. Vincent Charity Occupational Medicine,

6

complaining that side effects from the drug regimen included burning eyes and mild upper gastrointestinal discomfort.  Dr. Campbell sent Plaintiff to physical therapy which Plaintiff reported provided some relief.  Plaintiff used a cane to ambulate as suggested by her physical therapist (Docket No. 8, p. 188 of 548).

While participating in physical therapy Plaintiff was experiencing so much pain that she presented to St. Vincent Charity Occupational Medicine a day early on February 21, 2007, rather than on her scheduled appointment on February 22.  Review of the magnetic resonance imaging results from December 2006, showed the L1-L4 disk spaces were without significant pathology and the L5-S1 disk spaces showed moderate annular protrusion of the disk.  Plaintiff also had some bilateral facet arthropathy resulting in mild left nerve root impingement and moderate right nerve impingement.  Dr. Campbell continued the prescriptions for a pain reliever pending a neurosurgery consultation (Docket No. 8, pp. 181-182 of 548).

On March 5, 2007, Dr. Watkins considered that Dr. Colin Lee did not think that Plaintiff was a candidate for surgery so she thought it appropriate to submit a request for authorization to make epidural injections.  She further recommended aquatic therapy (Docket No. 8, pp. 183-184 of 548).

Also on March 5, 2007, Dr. Kirby J. Flanagan, M.D., conducted an evaluation for BWC wherein he reviewed the medical records and determined that to a reasonable degree of medical probability, Plaintiff's requested period of disability from February 9, 2007 through March 5, 2007 was not related to the June 2, 2006-injury (Docket No. 8, p. 186 of 548).

Dr. Robert F. Richardson, Jr., M. D., conducted a neurodiagnostic study on March 14, 2007, and the results showed no electrophysiological evidence of lumbar radiculopathy, plexopathy or peripheral neuropathy in the right leg.  In his brief examination, Dr. Richardson suspected local arthritis in the right sacroiliac joint (Docket No. 8, pp. 237-238 of 548).

7

On March 16, 2007, Plaintiff presented to Dr. Campbell, who suspected that Plaintiff had more than one source of significant pain. Dr. Campbell noted evidence of disk protrusion at L5-S1 on the magnetic resonance imaging study. The negative results from the electromyography assisted Dr. Campbell focus on the right S1 joint as a source of pain. In fact, she suspected right sacroiliac strain (Docket No. 8, pp. 266-267 of 548).

On March 26, 2007, Plaintiff presented to Dr. Campbell, who acknowledged that nothing seemed to make Plaintiff better; however, Plaintiff declined the doctor's offer to administer injections at six trigger points. In the alternative, Dr. Campbell showed Plaintiff's husband how to apply ischemic pressure to all of the sore points (Docket No. 8, pp. 249-250 of 548).

Plaintiff presented to Dr. Campbell on April 2, 2007, with hearing issues. The dosage of Valium was reduced until the hearing issues were resolved. Another discussion was had regarding injections at trigger points. Dr. Campbell was uncertain that this message was positively received because of cultural issues (Docket No. 8, pp. 244-245 of 548).

The physical therapist wrote on April 2, 2007, that Plaintiff had made no improvement during the last seven sessions, probably because there was a break in therapy from February 19, 2007 through March 26, 2007. At this juncture, Plaintiff was no longer motivated to participate in physical therapy and now aquatic therapy was recommended (Docket No. 8, p. 253 of 548).

Plaintiff presented to Dr. Campbell on April 9, 2007, and reported that she was doing better. In fact, she looked a "little more comfortable. Moving a little more easily." Her pain was a seven on an ascending scale of one to ten where 10 is equated with severe pain. A request for three additional weeks of physical therapy was made (Docket No. 8, pp. 247-248 of 548).

On May 3, 2007, Plaintiff presented to the office of Dr. Osorio complaining of frequent urination. She cried throughout the examination and explained that she was having moderate pain

8

from a kidney stone.  Plaintiff showed signs of depression without suicidal ideations and anxiety; accordingly, Dr. Osorio prescribed medication used to treat a depressive disorder and/or anxiety and recommended psychiatric treatment (Docket No. 8, p. 345 of 548).

Dr. Campbell determined on May 7, 2007, that because Plaintiff could not tolerate an hour of light duty, she would authorize her release from work.  The prescriptions for Valium and Percocet were continued (Docket No. 8, pp. 241-242 of 548).

On May 7, 2007,  test results  showed a glucose level that was higher than the normal range.. Plaintiff's hemoglobin, hematocrit, creatinine and red blood count were lower than the normal range (Docket No. 8, pp. 312-313 of 548).

The physical therapist published a progress report on May 7, 2007, that summarized Plaintiff's participation in therapy.  The therapist wrote that Plaintiff started therapy on February 16, 2007, and she completed nine sessions.  There was slight improvement with treatment and there would be no improvement without treatment.  Nine additional sessions were requested (Docket No. 8, p. 243 of 548).

Plaintiff returned to Dr. Osorio on May 9, 2007 because of depression.  Dr. Osorio noted that Plaintiff was still having itchiness, she was still suffering from low back pain secondary to the disc disease and she had not passed the kidney stone.  Dr. Osorio referred Plaintiff to her urologist (Docket No. 8, p. 344 of 548).

Dr. Osorio addressed the rash in the extensor surfaces of Plaintiff's hands.  The persistent rash was determined to be secondary to scabies versus Plaintiff's anxiety.  Dr. Osorio suggested that Plaintiff continue on the medication used to treat depressive disorders and anxiety (Docket No. 8, p. 343 of 548).

Plaintiff presented to Dr. Campbell on May 31, 2007 for followup care.  Plaintiff complained

9

that her pain was an eight on an ascending scale of 1 to 10, with ten being the most severe.  Dr. Campbell noted that Plaintiff tended toward hysteria and she opined that Plaintiff was not as uncomfortable as she had witnessed in past visits.  Dr. Campbell recommended that Plaintiff take regular doses of Valium and Percocet; that she maintain a home exercise program; and that she should get back to light duty work (Docket No. 8, pp. 239-240 of 548).

Plaintiff returned to Dr. Campbell on June 8, 2007 for a follow-up visit.  At the time Plaintiff was in a moderate amount of distress.  Plaintiff had a lot of voluntary guarding and a decreased range of motion.  The straight leg raises bilaterally produced pain.  There was exaggerated tenderness at the trigger points in the gluteal area.  At that juncture, Dr. Campbell started Plaintiff on Oxycodone (Docket No. 8, pp. 236-237 of 548).

Plaintiff complained of difficulty swallowing.  The results from the diagnostic tests showed spontaneous gastroesophageal reflux.  In other words, the refluxed material ascended to the proximal esophagus and was cleared rapidly with subsequent dry swallows (Docket No. 8, p. 366 of 548).

Plaintiff saw Dr. Campbell on June 13, 2007 for a follow-up visit.  Plaintiff explained that she had taken Oxycodone for pain but subsequently forcefully vomited.  Dr. Campbell replaced the pain medication with Percocet (Docket No. 8, p. 234 of 548).

After several sessions of physical therapy, Plaintiff was discharged on June 22, 2007, with instructions for continued home treatment.  The plan for home treatment included the use of a T-band and exercise equipment that promoted the use of the lower back to control lumbar extension and hip extension (Docket No. 8, pp. 274; 275-287 of 548).

Plaintiff presented to Dr. Campbell on July 3, 2007 for a follow-up visit.  Plaintiff reported that she obtained significant pain relief while taking four aquatic sessions.  Dr. Campbell approved nine additional visits (Docket No. 9, pp. 232-233 of 548).

For the BWC, Dr. Robert B. Leb, M.D., an orthopedic surgeon, conducted an independent evaluation on July 13, 2007.  Upon physical examination of the lumbrosacral spine, Dr. Leb noted no spinal listing, no lordotic curve abnormality, no scarring, no color changes, no swelling and no temperature change.  There was some tenderness along the lumbrosacral paraspinals and there was some spasm and guarding in this area.  There was some abnormality observed in the range of motion but no muscle strength abnormality was noted.  There were no changes in the lower extremity circumferences and Plaintiff's reflexes were within normal limits.  Although Plaintiff was stiff back and antalgic, she could stand and balance within normal limits.  Dr. Leb concluded that no further treatment options or diagnostic tests were necessary on Plaintiff's claim because she had reached maximum medical improvement (Docket No. 8, pp. 226-228 of 548).

On July 17, 2007, Plaintiff presented to Dr. Campbell for follow up care.  On this date, Plaintiff was "pretty comfortable" even though her symptoms fluctuated.  Plaintiff was walking a little better and changing position better.  Dr. Campbell noted that there was evidence of mild spasm on the right in the lumbar and gluteal area (Docket No. 8, pp. 230-231 of 548).

On August 7, 2007, Dr. John Schnell, M.D., a physical/internal medicine specialist, addressed whether Plaintiff suffered from lumbar disc displacement, without myelopathy.  Upon review of the medical history, including diagnostic testing, Dr. Schnell concluded that "the story reads as a persistent right sided lower back pain, with non-verifiable right leg complaints, with a mild 2-3 mm disc bulge at L5."  Accordingly, Dr. Schnell recommended that Plaintiff's worker compensation claim be denied as to the lumbar disc displacement without myelopathy claim (Docket No. 8, pp. 223-225 of 548).

Plaintiff completed her aquatic therapy and on August 14, 2007, she presented to Dr. Campbell, who opined that the aquatic therapy resulted in some objective improvement.  In

11

particular, Plaintiff did not look like her pain was as severe as she suggested.  Dr. Campbell noted that Plaintiff was moving moderately well and there was an absence of spasm and tenderness on the left and decreased spasm and tenderness on the right.  Plaintiff did not concur that there was objective improvement.  However, Dr. Campbell recommended that Plaintiff seek further treatment and evaluation from her primary care physician and that Plaintiff should try a transitional return to work (Docket No. 8, pp. 221-222 of 548).

Plaintiff presented to Dr. Osorio on August 29, 2007, with complaints of low back pain that was worsening with time.  Dr. Osorio referred Plaintiff to orthopedics (Docket No. 8, p. 342 of 548).

A diagnostic procedure administered on September 4, 2007, showed multiple pockets of bowel gas and vascular calcifications obscuring the lower sacrum (Docket No. 8, p. 365 of 548).  Results of the metabolic panel derived from the samples collected on September 4, 2007, showed elevated chloride and monocyte levels that slightly exceeded the reference range set by health professions to interpret what is normal in healthy individuals (Docket No. 8, p. 373 of 548).

On September 14, 2007, Dr. William R. Bohl, M.D, conducted a physical examination and review of the diagnostic evidence.  He concluded that Plaintiff's symptoms did not appear to show any significant compression of the nerve root but Plaintiff appeared to have "a lot of irritation" at the nerve root.  He suggested that Plaintiff stay the course which meant she continue the current drug and physical therapies (Docket No. 8, p. 220 of 548).

Plaintiff presented to Dr. Osorio on October 1, 2007, for followup after going to physical therapy.  Plaintiff reported that her pain was unchanged even with the pain medication (Docket No. 8, p. 341 of 548).

On October 12, 2007, a plan was implemented for physical therapy through the Lutheran Hospital.  Plaintiff participated in therapy weekly through November 5, 2007.  The therapist opined

12

that Plaintiff did not benefit from physical therapy (Docket No. 8, pp. 304-311 of 548).

For "United States Evaluations, Incorporated," Dr. Robert F. Shadel, M. D., conducted an evaluation for purposes of resolving the contested condition of disc displacement.  Dr. Shadel determined that:

- There was no disc displacement.
- The bulge at L5-S1 was not caused by injury but appeared to be a characteristic of chronic degenerative changes of natural deterioration (Docket No. 8, pp. 439-441 of 548).

Results from the X-ray of the abdomen administered on October 29, 2007, showed calcifications adjacent to L4/L5 and multiple pelvic phleboliths were present on both sides (Docket No. 8, p. 364 of 548).

Plaintiff was doing "okay" on November 9, 2007, when she saw Dr. Osorio.  Dr. Osorio opined that the depression was controlled with medication. After he diagnosed Plaintiff with gastrointestinal reflux disease, Dr. Osorio gave her samples of Prevacid, a medication that reduces the amount of acid produced in the stomach (Docket No. 8, p. 340 of 548).

On November 19, 2007, Plaintiff underwent a magnetic resonance imaging scan of the lumbar spine.  The results were unremarkable (Docket No. 8, p. 433 of 548).

On December 17, 2007, Dr. Emad Daoud, M. D., administered one in a series of three transforaminal epidural steroid injections at the right L5-S1 level to Plaintiff under local anesthesia. The second and third injections were given on January 10, 2008 and January 24, 2008, respectively (Docket No. 8, pp. 292-303 of 548).

Dr. Mark Querry, Ph. D., conducted an independent psychological evaluation on March 4, 2008, using a clinical interview, mental status evaluation and provided medical documentation as the basis for his decision.  His responses to the BWC's interrogatories are summed as follows:

13

- The medical evidence corroborates the presence of a depressive disorder, not otherwise specified. There were no criteria for a bipolar disorder.
- Plaintiff's depression appears to have developed as her functional capacity declined from her injury at work.
- Plaintiff was not participating in an outpatient mental health treatment although she was medicated.
- Plaintiff's psychological condition was a direct and proximate result of the industrial injury.
- Plaintiff's depressive disorder did not predate her industrial injury.
- Plaintiff could participate in the job role that is commensurate with her education, training and experience (Docket No. 8, pp. 409-414 of 548).

On April 17, 2008, Dr. Bohl noted that epidural blocks did not help Plaintiff and that she continued to be painful with conservative treatment. Dr. Bohl continued the prescription for Vicodin and referred Plaintiff to pain management (Docket No. 8, p. 407 of 548).

On April 28, 2008, Dr. Bohl completed a form provided by the Bureau of Disability Determination, in which he opined that Plaintiff had:

1. Low back pain.
2. L5 disc dehydration, minimal bulge.
3. L5 root impingement on the right.

Dr. Bohl confirmed that the intensity/persistence of symptoms and/or pain was customary with the degree of physical findings. It was his opinion that Plaintiff had no sensory and motor loss but she did have limited motion in the joints (Docket No. 8, pp. 336-337 of 548).

Plaintiff was still having pain in the kidneys when she saw Dr. Osorio on April 29, 2008. Plaintiff's anxiety was uncontrolled and she had developed hemorrhoids and rectal pain. A suppository was prescribed for the rectal pain and a referral was made to a gastroenterologist (Docket No. 8, p. 339 of 548).

On May 9, 2008, Dr. Saroj B. Brar, M.D., a psychiatrist, completed the request by BDD for a description of mental abnormalities and accompanying cognitive and functional defects. Describing Plaintiff as depressed, Dr. Brar noted that Plaintiff was slightly less depressed when

14

taking medication.  Dr. Brar also noted that Plaintiff had average intellectual functioning, she was capable of relating to the general public and she was capable of caring for herself (Docket No. 9, pp. 389-390 of 548; www.healthgrades.com/physician/dr-saroj-brar-xmbpm).

On May 15, 2008, Plaintiff underwent a diagnostic examination to rule out kidney stones. Except for the size discrepancy, the study was unremarkable (Docket No. 8, p. 363 of 548).

On May 17, 2008, Plaintiff was examined by Dr. Mirza I. Baig, M. D., a board certified internal medicine specialist, who answered interrogatories posed by BWC.  In Dr. Baig's opinion, the following had occurred:

- Plaintiff had reached maximal medical improvement.
- Plaintiff could not return to her former position of employment because of persistent complaints of pain.
- Plaintiff would benefit from a functional capacity evaluation and vocational rehabilitation.
- Plaintiff would benefit from pain management (Docket No. 8, pp. 397-399 of 548).

Moreover, on June 1, 2008, Dr. Baig suggested that Plaintiff could:

1. Occasionally lift and/or carry up to twenty pounds and occasionally lift above her shoulders.
2. Frequently stand/walk.
3. Frequently sit.

These estimates were based on an assessment of Plaintiff work and non work capabilities over an eight-hour workday (Docket No. 8, p. 400 of 548).

Dr. Cynthia Waggoner, Psy. D., completed the MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT and the PSYCHIATRIC REVIEW TECHNIQUE analysis on June 6, 2008, in which she assessed Plaintiff's mental disorders.  Her summary conclusions as to Plaintiff's capacity to sustain that activity over a normal workday and workweek on an ongoing basis, was moderately limited in the following functional capacities:

- The ability to understand and remember detailed instructions.
- The ability to carry out detailed instructions.
- The ability to complete a normal workweek and workday without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.
- The ability to respond appropriately to changes in the work setting.
- The ability to set realistic goals or make plans independently of others (Docket No. 8, pp. 476-479 of 548).

It was Dr. Waggoner's opinion that Plaintiff had a major depressive disorder and that she had the following impairment-related functional limitations:

| | | |
|---|---|---|
| 1. | Restriction of activities of daily living | Moderate |
| 2. | Difficulties in maintaining social functioning | Moderate |
| 3. | Difficulties in maintaining concentration, persistence or pace | Moderate |
| 4. | Episodes of decompensation, each of extended duration | None |

There were no Paragraph C criteria or alternative impairment-related functional limitations that are also incompatible with the ability to do gainful activity (Docket No. 8, pp. 462-473 of 548).

Having last seen Plaintiff on July 23, 2008, Dr. Bohn completed an updated questionnaire on Plaintiff's back pain.  Noting that the pain radiated from Plaintiff's lower back to her  feet, Dr. Bohl opined that the intensity/persistence of the symptoms was not customarily seen in association with the findings described.  He also noted a lack of significant objective findings to support motor loss.  Dr. Bohl concurred that there was limited motion in the joints and/or spine and Plaintiff's gait was awkward (Docket No. 8, pp. 489-494 of 548).

Dr. W. Jerry McCloud, M. D., conducted a PHYSICAL RESIDUAL FUNCTIONAL CAPACITY assessment  on June 12, 2009 and found the following:

- Plaintiff can occasionally lift and/or carry twenty pounds.
- Plaintiff can frequently lift and/or carry ten pounds.
- Plaintiff can stand and/or walk about six hours in an eight-hour workday.
- Plaintiff can sit about six hours in an eight-hour workday.
- Plaintiff can push and/or pull on an unlimited basis.
- Plaintiff has no communicative, environmental, manipulative, postural or visual

16

limitations (Docket No. 8, pp. 480-488 of 548).

On September 19, 2008, Dr. Brar wrote that Plaintiff's depression was gradually getting worse since the injury in her neck.  Plaintiff was well medicated and she was undergoing supportive psychotherapy to assist with the pain management along with depressive symptoms (Docket No. 8, p. 495 of 548).

Dr. Bohl performed an L5-S1 laminectomy and diskectomy on June 30, 2009 (Docket No. 8, pp. 497-498 of 548).  Dr. Bohl advised that the odds of this surgery resolving the back pain was 50% and two weeks post L5 laminectomy and diskectomy, Plaintiff was still having back pain (Docket No. 8, p. 516 of 548).  Eight weeks post L5 laminectomy and diskectomy, Plaintiff continued to have discomfort in the lower back radiating to her thighs (Docket No. 8, p. 514 of 548). Three months post L5 laminectomy and diskectomy, Dr. Bohl observed that Plaintiff may have longer symptoms arising from the slight keloid formation at the cite of the incision (Docket No. 8, p. 512 of 548).  Five months' status post L5 laminectomy and diskectomy, the X-ray of the lumbar spine showed very minimal lumbar scoliosis concave to the left, minimal disk space narrowing at L5-S1, a relatively straight lumbar spine and no apparent areas of significant arthritis or foraminal narrowing (Docket No. 8, p. 510 of 548).  The X-ray administered on November 23, 2009 showed mild lumbar scoliosis concave to the left (Docket No. 8, p. 520 of 548).

Plaintiff participated in physical therapy from June 30, 2009 through August 18, 2009. Plaintiff reported no improvement in her symptoms as a result (Docket No. 8, p. 521 of 548).

Dr. Bradley A. Blackburn, M.D., performed a magnetic resonance imaging scan on December 7, 2009.  The results showed persistent, mild central annular bulging at the L5 level with disc dehydration but no evidence of canal stenosis and minimal neural foraminal compromise and

17

nerve root impingement (Docket No. 8, pp. 499-500 of 548).

Upon referral from the Ohio BWC, Dr. Robert F. Dallara, Jr., Ph.D., conducted a clinical and diagnostic evaluation on January 20, 2010.  On the Beck Depression Inventory, a clinical test that measures the severity and depth of depression, Plaintiff attained a score of 42 which was indicative of severe depression.  Dr. Dallara opined that Plaintiff's depression would make it difficult for her to relate to others and significantly impair her ability to withstand pressure associated with the day-to-day work activity (Docket No. 8, pp. 502-505 of 548; www.BeckDepressionInventory).  Dr. Hong Shen, M.D., a physical medicine and rehabilitation physician, diagnosed Plaintiff with displacement of a lumbar intervertebral disc without myelopathy and sprain lumbar region on January 22, 2010.  He provided a transdermal pain patch for application to the low back area.  Dr. Shen also prescribed a pain reliever (Docket No. 8, p. 523 of 548).

In February 2010, Dr. Shen increased the pain reliever and recommended acupuncture treatment (Docket No. 8, p. 524 of 548).

On March 17, 2010, Dr. Shen noticed that Plaintiff had a mild antalgic gait.  He decreased the dosage of pain medication to increase its compatibility with other medications.  Dr. Shen suggested that Plaintiff participate in aquatic therapy (Docket No. 8, p. 526 of 548).

**B.  EVIDENCE PRESENTED TO THE APPEALS COUNCIL.**

On December 20, 2010, Dr. John G. Nemunaitis, M.D., completed a "specialist report" for the State of Ohio Industrial Commission, in which he made the following findings:

- Plaintiff does have moderate back pain; however, there is significant psychological contribution to her pain.
- Plaintiff had no signs of an acute radiculopathy based on her examination but she did have a mild residual neurological deficit.

- Plaintiff has reached maximum medical improvement with regard to her lumbar region impairment.
- Plaintiff was capable of functioning at a sedentary work capacity, based on her allowed condition but subject to lifting ten pounds frequently and limitations on bending, squatting, and kneeling (Docket No. 8, pp. 539-543 of 548).

Also on December 20, 2010, Dr. Robert L. Byrnes, Ph.D., interviewed Plaintiff and administered an evaluation provided by the Industrial Commission.  Dr. Byrnes concurred that Plaintiff had reached the maximum medical improvement relative to her mental condition, depressive disorder.  Based on the history findings and examination, it was Dr. Byrnes' opinion that Plaintiff's clinical picture was consistent with the following diagnosis:

- Axis I diagnoses acute symptoms that need treatment.  In this case, Dr. Byrnes determined that Plaintiff had a depressive disorder, not otherwise specified (from history).
- Axis IV is for reporting psychological and environmental stressors that may affect the diagnoses, treatment and prognosis of mental disorders.  In this case, Dr. Byrnes determined that the stressors in Plaintiff's life included reported physical impairment and ongoing pain.
- Axis V is a reflection of the evaluating clinician's judgement of a patient's ability to function in daily life, otherwise known as the Global Assessment of Functioning scale. This 100-point scale measures psychological, social and occupational functioning.  Dr. Byrnes attributed a current score of 55 or a finding that Plaintiff had moderate symptoms (ex: flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (ex: few friends, conflicts with peers/co-workers).

Dr. Byrnes found that Plaintiff had moderate limitations in:

- Activities of daily living.
- Social functioning.
- Concentration, persistence and pace.

Ultimately, Dr. Byrnes opined that Plaintiff was incapable of work (Docket No. 8, pp. 544-547 of 548; DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 4th ed.).

### V.  THE LEGAL FRAMEWORK FOR EVALUATING DIB CLAIMS

The Commissioner's regulations governing the evaluation of disability for DIB are found

at 20 C. F. R. § 404.1520.  *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  DIB is available

only for those who have a "disability."  *Id.* (*citing* 42 U.S.C. §§ 423(a) and (d), *See also* 20 C. F. R.

§ 416.920).  "Disability" is defined as the "inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to result

in death or which has lasted or can be expected to last for a continuous period of not less than 12

months." *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *See also* 20 C.

F.R. § 416.905(a) (same definition used in the SSI context)).  To be entitled to DIB, a claimant must

be disabled on or before the date his or her insured status expires.  *Key v. Callahan*, 109 F. 2d 270,

274 (6th Cir. 1997).

To determine disability, the Commissioner has established a five-step sequential evaluation

process for disability determinations found at 20 C. F. R. § 404.1520.  *Colvin*, *supra*, 475 F. 3d at

730.  First, plaintiff must demonstrate that she is not currently engaged in "substantial gainful

activity" at the time she seeks disability benefits.  *Id.* (*citing* [*Abbott v. Sullivan*, 905 F.2d 918, 923

(6th Cir. 1990)].

Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant

a finding of disability.  *Id.*  A "severe impairment" is one which "significantly limits . . . physical

or mental ability to do basic work activities." *Id.*

Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that

is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff

is presumed to be disabled regardless of age, education or work experience.  *Id.*

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work,

plaintiff is not disabled.  *Id.*

20

For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled.  *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 525, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original).  If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates.  *Id.* (*citing* 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).

## VI. THE ALJ'S FINDINGS.

After careful consideration of the medical evidence, the legal framework for establishing disability and the entire record, the ALJ made the following findings:

1.  At step one, Plaintiff met the insured status requirements of the Act through December 31, 2012.  She had not engaged in substantial gainful activity since February 9, 2007, the alleged onset date.

2.  At step two, Plaintiff had severe impairments, namely, degenerative disc disease of the lumbar spine and a depressive disorder.

3.  At step three, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Moreover, Plaintiff had the residual functional capacity to perform sedentary work, except that she:
    - Must have a sit/stand option every thirty minutes.
    - Can occasionally climb ramps or stairs.
    - Can occasionally bend, balance, or stoop; she can never kneel or crawl.
    - Can handle, finger and feel.
    - Can frequently reach in front and occasionally reach overhead.
    - Can perform simple routine tasks with simple short instructions.
    - Can make simple work decisions in an environment with few workplace changes.
    - Can have minimal public contact.

4.  At step four, Plaintiff was unable to perform any past relevant work.

5.  At step five, Plaintiff was 40 years of age on the day her alleged disability began.  Plaintiff had at least a high school education and she was able to communicate in English.

21

6.    Considering her age, education, work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. Plaintiff has not been under a disability, as defined in the Act from February 9, 2007, through the date of this decision.

(Docket No. 8, pp. 16-25 of 548).

## VII. STANDARD OF REVIEW.

A district court's review of a final administrative decision of the Commissioner made by an ALJ in a Social Security action is not *de novo*. *Norman v. Astrue*, 694 F. Supp.2d 738, 740 (N. D. Ohio 2010) *report adopted by* 2011 WL 233697 (N. D. Ohio 2011). Rather, a district court is limited to examining the entire administrative record to determine if the ALJ applied the correct legal standards in reaching his decision and if there is substantial evidence in the record to support his findings. *Id.* (*citing Longworth v. Commissioner of Social Security*, 402 F.3d 591, 595 (6th Cir. 2005)). "Substantial evidence" is evidence that a reasonable mind would accept to support a conclusion. *Id.* (*See Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971)).

The substantial evidence standard requires more than a scintilla, but less than a preponderance of the evidence. *Id.* at 740-741. To determine whether substantial evidence exists to support the ALJ's decision, a district court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Id.* (*citing Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). Further, a district court must not focus, or base its decision, on a single piece of evidence. Instead, a court must consider the totality of the evidence on record. *Id.* (*see Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980); *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978)). In fact, if there is conflicting evidence, a district court generally will defer to the ALJ's findings of fact. *Id.*

The Sixth Circuit instructs that "[t]he substantial evidence standard allows considerable latitude to administrative decision makers. *Id.* It presupposes that there is a zone of choice within

22

which the decision maker can go either way without interference by the courts." *Id.* (*citing Mullen v. Bowen*, 800 F.2d 535, 545 (6ᵗʰ Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8ᵗʰ Cir. 1984)) (emphasis added)).  Accordingly, an ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Id.* (*citing Jones v. Commissioner of Social Security*, 336 F.3d 469, 477 (6ᵗʰ Cir. 2003)).  However, even if an ALJ's decision is supported by substantial evidence, that decision will not be upheld where the Commissioner "fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Id.* (*citing Bowen v. Commissioner of Social Security*, 478 F.3d 742, 746 (6ᵗʰ Cir. 2007)).

## VIII. PLAINTIFF'S ARGUMENTS.

Plaintiff argues that the ALJ's decision is not based on substantial evidence given the harmful errors made in determining that Plaintiff was not under a disability.  Specifically, Plaintiff contends that the ALJ failed to:

1. Consider Plaintiff's physical and mental health impairments in combination with each other.
2. Attribute controlling weight to Dr. Brar's opinions and alternately failed to explain why such opinions were not entitled to controlling weight.
3. Pose a hypothetical question that accurately described the limitations which were critical to establishing her worker's compensation claim.
4. Appropriately discount her credibility as to pain symptoms.
5. Consider the evidence submitted to the Appeals Council.

Defendant contends that:

1. Plaintiff failed to meet her burden of proving that she was disabled under the Act.
2. The ALJ followed the controlling regulations in assessing Plaintiff's mental limitations.
3. The ALJ followed the controlling regulations in assessing the opinion evidence regarding Plaintiff's mental limitations.
4. The ALJ accounted for Plaintiff's physical limitations that were credibly established.

5.  The ALJ followed the controlling regulations in assessing credibility of Plaintiff's complaints about her limitations.

6.  Evidence presented for the first time following the ALJ's decision does not warrant remand.

### IX. ANALYSIS.

**1.  COMBINATION OF IMPAIRMENTS.**

Plaintiff argues that the ALJ failed to properly consider the combination of her unrelenting back pain and depression.  It is her contention that the combination of these impairments entitles her to a presumptive finding of disability.

Pursuant to 20 C.F.R. § 404.1523, the ALJ is required to consider the "combined effect" of all a claimant's impairments in determining whether a medically severe combination of impairments exists. *Monroe v. Commissioner of Social Security*, 2013 WL 2295987, *8 (S.D.Ohio,2013).  If the ALJ determines that a claimant does not have a medically severe combination of impairments, the Act and regulations mandate a determination that the claimant is not disabled. *Id.* (*See* 20 C.F.R. § 404.1523 ("If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled")).

Here, the ALJ's decision shows that he properly considered the combined effects of Plaintiff's physical and mental impairments.  He explicitly stated that Plaintiff "does not have an impairment or combination of impairments that medically equals one of the listed impairments."  The ALJ discussed Plaintiff's specific medical and psychological problems and referred to them in combination with each other.  Moreover, in determining Plaintiff's residual functional capacity, the ALJ considered both physical and mental impairments.  The ALJ restricted Plaintiff to jobs with a

sit/stand option every thirty minutes, occasionally climbing ramps or stairs, bending, balancing or stooping.  In light of Plaintiff's depressive disorder the ALJ restricted her to jobs that were limited to making simple work decisions and limited to simple, routine tasks with minimal public contact.  The ALJ's decision demonstrates that the Plaintiff's mental and physical impairments were considered collectively.  The reasoned analysis that Plaintiff's impairments do not meet either singly or in combination with each other a listed impairment is supported by substantial evidence.

### 2. DR. BRAR'S OPINION.

Plaintiff claims that Dr. Brar's opinions were entitled to controlling weight.  Plaintiff suggests that the ALJ overlooked the treating source rule when assigning equal weight to the opinions of State agency psychologists, Drs. Dallara, Querry and Waggoner and Dr. Brar.

Under the treating physician rule, the Commissioner has mandated that the ALJ "will" give a treating source's opinion controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record."  *Cole v. Astrue,* 661 F.3d 931, 937 (6th Cir. 2011) (*citing* 20 C.F.R. § 404.1502).  *Id.* (*citing* 20 C.F.R. § 404.1527(d)(2)).  If the ALJ declines to give a treating source's opinion controlling weight, he or she must then balance the following factors to determine what weight to give it, specifically, the "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source."  *Id.* (*citing Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir.2004) (*citing* 20 C.F.R. § 404.1527(d)(2)).

The Commissioner imposes on its decision makers a clear duty to "always give good reasons in our notice of determination or decision for the weight we give [a] treating source's opinion."  *Id.*

(*citing* 20 C.F.R. § 404.1527(d)(2)).  Those good reasons must be "supported by the evidence in the

case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight

the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Id.*

(*citing* TITLES II AND XVI: GIVING CONTROLLING WEIGHT TO TREATING SOURCE MEDICAL

OPINIONS, SSR 96-2p, 1996 WL 374188, *1 (1996)).  The regulations mandate that unless the

treating physician's opinion is given controlling weight, the ALJ is required to explain the decision

and the weight given to the opinions of the State agency medical or psychological consultants and

other program physicians or psychologists as the ALJ must do for any opinion from treating sources,

nontreating sources and other nonexamining sources.  20 C. F. R. § 404.1527(f)(2)(ii) (Thompson

Reuters 2013).

       In the instant case, the ALJ correctly described the legal standards applicable under the

treating physician rule and also correctly described the additional regulatory factors that apply to

treating physicians and other medical sources under 20 C.F.R. §§ 404.1527 (Docket No. 8, p. 20 of

548).  Then the ALJ gave serious consideration to Dr. Brar's role as Plaintiff's psychiatrist and the

treatment relationship that continued for a year.  The ALJ also considered that Dr. Brar's opinions

were deeply rooted in the nature and severity of Plaintiff's mental impairments; and his opinions

were generally consistent with other evidence.  Based on this evidence, the ALJ was able to

determine that Dr. Brar's opinions were not entitled to controlling weight.  Applying the reason-

giving requirement to Dr. Brar's opinion, the ALJ determined that Dr. Brar's opinions were entitled

deferential weight because Plaintiff's claim that she could handle stress and interact well with others

was inconsistent with Dr. Brar's conclusion that she could not tolerate stress (Docket No. 8, pp. 21;

23; 121 of 548).

Because the ALJ did not give controlling weight to Dr. Brar's opinions, the ALJ was required to explain the weight given to the State agency physicians. The regulations specifically mandate that the ALJ weigh the opinions of Drs. Dallara, Querry and Waggoner using relevant factors, including supportability, consistency, and specialization. The ALJ determined that all of these opinions had some value only insofar as they were supported by the evidence. It was appropriate that the opinions of the State agency psychological consultants were entitled to weight equal to that of the treating physician as they were based on the complete review of the case record which provided comprehensive information that may not have been available to Dr. Brar. The Magistrate concludes that the ALJ appropriately observed the regulations when considering the opinions of the State agency physicians and determining what weight to apportion to each.

### 3.  THE HYPOTHETICAL QUESTION.

Plaintiff contends that the hypothetical question posed to the VE did not accurately reflect her limitations since it failed to incorporate limitations derived from evaluations completed by Drs. Baig, Bohl and Purewal; her inability to withstand stress and pressure associated with day-to-day work; her inability to concentrate; and her ability to become easily frustrated.

The hypothetical question posed to the VE must include the claimant's impairments because without an actual depiction of the limitations, the VE will not be able to accurately access whether jobs do exist that the claimant can perform with his or her impairments. *Schroeder v. Commissioner of Social Security*, 2012 WL 7657831, *18 (N.D.Ohio,2012) (*citing Lamtman v. Commissioner of Social Security*, 2012 WL 2921705, *14 (N.D.Ohio,2012)). The hypothetical question posed to a VE for purposes of determining whether a claimant can perform other work should be a complete assessment of the claimant's physical and mental state and should include an accurate portrayal of the claimant's physical and mental impairments. *Id.* (*citing Farley v. Secretary of Health and*

*Human Services*, 820 F.2d 777, 779 (6th Cir.1987); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir.1975) (per curiam)).

Generally, the hypothetical question should focus on the claimant's overall state. *Id.* It need not include lists of the claimant's medical conditions. *Id.* at 633. An ALJ is only required to incorporate into the hypothetical question, limitations that he or she accepts as credible. *Id.* (*citing Petro v. Astrue*, 2009 WL 773283, *4 (E.D.Ky.2009) (*citing Sias v. Secretary of Health and Human Services*, 861 F.2d 475, 480 (6th Cir.1988)).

Dr. Baig's first opinion completed on May 17, 2008, offered little by way of a complete assessment of Plaintiff's physical and mental impairments. Dr. Baig had no treatment relationship with Plaintiff and when conducting the one-time clinical interview, relied heavily on medical data provided by various independent medical examiners, who also had no treatment relationship with Plaintiff. Dr. Baig's conclusions are not supported by the evidence and the ALJ was only required to incorporate those limitations into the hypothetical that he found credible. Ironically, the limitations suggested by Dr. Baig in the DEP PHYSICIAN'S REPORT OF WORK ABILITY form completed on June 1, 2008, were incorporated in the hypothetical question posed to the VE as such limitations were deemed consistent with limitations imposed by Plaintiff's treating sources and therefore considered credible by the ALJ (Docket No. 8, pp. 45-46; 400 of 548).

The ALJ did not err in failing to incorporate the opinions of Dr. Bohl into the hypothetical question (Docket No. 8, pp. 336-337 of 548). Dr. Bohl found that Plaintiff had no motor loss, no inability to do fine and gross manipulation and a limited ability to bend forward and backward. The absence of motor loss or ability to engage fine and gross manipulation was not probative of claimant's physical and mental impairments. Because other reliable sources concurred with Dr. Bohl's determination that Plaintiff was incapable of bending, such consideration was included in the

hypothetical question.

Dr. Purewal determined that pursuant to the worker's compensation standards, Plaintiff was entitled to reinstatement for temporary total disability from September 14, 2007 through January 27, 2008.  Under the Social Security regulations, a decision of any other governmental agency about whether the claimant is disabled is not based on social security law and therefore, a determination made by another agency that the claimant is disabled is not binding on the ALJ.  20 C. F. R. § 404.1504 (Thomson Reuters 2013).

Fourth, the Magistrate finds Plaintiff's claim that the ALJ failed to incorporate her inability to withstand stress and pressure associated with day-to-day work, her inability to concentrate and the ease with which she got frustrated into the hypothetical question, unavailing.  The ALJ asked the VE to consider that the hypothetical person was capable of performing single, routine tasks with simple, short instructions, simple work-related decisions with few workplace changes and limited contact with the public.  The Magistrate finds that this description was sufficient to describe the deficiencies of concentration, stress and frustration problems.  There are no speed, durational, pace or production restrictions imposed.  In other words, someone with these limitations could perform simple, rote tasks that could be learned quickly and without a significant focus.  More important, this limitation in the hypothetical question was adequate to convey that Plaintiff was limited to a low stress environment, that workplace changes would be easily accommodated and that contact with the public would be controlled.

In conclusion, the Magistrate finds that the ALJ's description to the VE adequately captioned her mental impairments.  The VE's testimony in that regard therefore served as substantial evidence to support the ALJ's step five finding.

29

4. **PAIN AND CREDIBILITY.**

Plaintiff contends that the ALJ committed reversible error when he failed to discuss the regulations required for assessing credibility.  Plaintiff suggests that as a consequence of failing to follow the rules, the ALJ improperly discounted her credibility and that decision is not supported by the evidence.

The Commissioner and his examiner, as the fact-finders, are authorized to pass upon the credibility of the witnesses and weigh and evaluate their testimony.  *Lucas v. Astrue,* 2013 WL 1150026, *10 (N.D.Ohio,2013) *report adopted by* 2013 WL 1150019 (N.D.Ohio 2013) (*citing Heston v. Commissioner of Social Security*, 245 F.3d 528, 536 (6th Cir.2001), *quoting Myers v. Richardson*, 471 F.2d 1265, 1267 (6th Cir.1972)).  If a disability determination that would be fully favorable to the claimant cannot be made solely on the basis of the objective medical evidence, then the ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in SSR 96–7p.  *Id.* (*See* TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS, SSR 96–7p, 1996 WL 374186, *1 (1996); 61 Fed. Reg. 34483, 34484–34485 (1990)).  These factors include:

1. The claimant's daily activities;
2. The location, duration, frequency and intensity of the pain;
3. precipitating and aggravating factors;
4. The type, dosage, effectiveness and side effects of any pain medication;
5. Any treatment, other than medication, that the claimant receives or has received to relieve the pain; and
6. Any measures other than treatment that the claimant uses or has used to relieve pain or other symptoms.
7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* (*citing Felisky v. Bowen*, 35 F.3d 1027, 1039–40 (6th Cir. 1994).

The ALJ may discount a claimant's credibility where the ALJ finds contradictions among the medical records, claimant's testimony, and other evidence. *Id.* (*citing Walter v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997). Since the ALJ has the opportunity to observe the claimant in person, a court reviewing the ALJ's conclusion about the claimant's credibility as to pain should be accorded great deference to that determination. *Id.* (*See Casey v. Secretary of Health and Human Services*, 987 F.2d 1230, 1234 (6th Cir.1993)). Nevertheless, an ALJ's assessment of a claimant's credibility as to pain must be supported by substantial evidence. *Id.* (*citing Walters*, *supra*, 127 F.3d at 531). As a general rule, the ALJ"s credibility finding must be reasonable and supported by substantial evidence. *Id.* (*citing Rogers v. Commissioner*, 486 F.3d 234, 249 (6th Cir. 2007)).

The ALJ acknowledged that the disability determination that would be favorable to Plaintiff could not be based on objective medical evidence; accordingly, the ALJ considered the factors in SSR 96-7p. There was minimal testimony or other evidence of significant activities of daily living so the ALJ gave considerable weight to the written disability report completed by Plaintiff. This report incorporated a detailed analysis of Plaintiff's daily activities and Plaintiff's testimony (Docket No. 8, pp. 19; 20; 21; 22 of 548).

The ALJ also considered Plaintiff's testimony regarding the duration, frequency and intensity of the pain as well as the assessments of Drs. Bohl, Campbell and Osorio who documented Plaintiff's complaints of pain (Docket No. 8, pp. 20; 21; 23 of 548).

Furthermore, the ALJ considered that Plaintiff emotional responses aggravated her pain and the only documented side effect from use of her medication was lightheadedness (Docket No. 8, pp.

20, 21-22 of 548).

Finally, the ALJ did not discuss in detail the type, dosage, effectiveness and side effects of any pain medication; however, he did discuss the use of an ambulatory device and failed surgeries that Plaintiff received to relieve pain (Docket No. 8, pp.

The factors delineated in SSR 96-7p are adequately explained throughout the decision and the ALJ actually concluded that Plaintiff was partially credible to the extent that her impairments could result in the symptoms alleged.  The ALJ discounted Plaintiff's credibility because the totality of the evidence strongly suggested that even with pain, Plaintiff was capable of performing the work activities inherent in the ALJ's residual functional capacity findings.

In conclusion, the Magistrate finds that the ALJ conducted an adequate credibility analysis from which meaningful review could be conducted.  Since the ALJ followed the regulations and his credibility determination is supported by substantial evidence, it will not be disturbed.

### 5   POST HEARING EVIDENCE.

Plaintiff argues that the evidence presented to the Appeals Council was new and material evidence which warrants a remand for review by the Commissioner.

In the Sixth Circuit, it is well established that where the Appeals Council considers new evidence but declines to review a claimant's application for DIB on the merits, the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision.  *Cline v. Commissioner of Social Security*, 96 F.3d 146, 148 (6th Cir. 1996) (*citing Cotton v. Sullivan*, 2 F.3d 692, 695 (6th Cir.1993))  The district court can, however, remand the case for further administrative proceedings in light of the evidence, if a claimant shows that the evidence is

new and material, and that there was good cause for not presenting it in the prior proceeding.  *Id*. (*citing Cotton*, 2 F. 2d at 696).

When the district court issues such a remand order, under sentence six of 42 U.S.C. § 405(g), it "does not rule in any way as to the correctness of the administrative determination.  Rather, the court remands because new evidence has come to light that was not available to the claimant at the time of the administrative proceeding and that evidence might have changed the outcome of the prior proceeding."  *Id.* at 148-149 (*citing Melkonyan v. Sullivan*, 111 S.Ct. 2157, 2163 (1991); *see also Faucher v. Secretary of Health and Human Services*, 17 F.3d 171, 173–75 (6th Cir.1994)).

Sentence six of section 405(g) states, in relevant part:  "The court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding; and the Commissioner of Social Security shall, after the case is remanded, and after hearing such additional evidence if so ordered, modify or affirm the Commissioner's findings of fact or the Commissioner's decision, or both, and shall file with the court any such additional and modified findings of fact and decision, and a transcript of the additional record and testimony upon which the Commissioner's action in modifying or affirming was based."  *Id.* at fn.1 (*citing* 42 U.S.C. § 405(g) (1995)).

The Magistrate finds that Plaintiff has failed to overcome the "new evidence" hurdle. Plaintiff's counsel requested a one-time chiropractic examination and on July 19, 2010, Dr. Brian Miles examined, but did not treat, Plaintiff.  Plaintiff never submitted Dr. Miles' reports to the ALJ who rendered a decision on June 8, 2011, almost a year after the evaluation had been completed. Similarly, the reports of Drs. Nemunaitis and Byrnes, both of which were completed in December 2010, were generated during the pendency of the administrative proceeding but never presented to

33

the Commissioner.

Plaintiff is not entitled to remand to introduce evidence that came to light and could have been produced to the Commissioner before the ALJ rendered his decision.  Since the elements of this test are in the conjunctive, the finding that the evidence was not new, relieves the Magistrate from determining if the evidence was material and if Plaintiff had good cause for the delay in presenting such evidence.  The Magistrate recommends that the Court deny Plaintiff's request for a sentence six remand on this issue.

### X.  CONCLUSION

For these reasons, the Magistrate recommends that this Court affirm the Commissioner's decision and terminate the referral to the undersigned Magistrate Judge.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:   November 1,  2013

34

## XI.  NOTICE FOR REVIEW

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed.  Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof.  Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure.  The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please be further advised that the Sixth Circuit Court of Appeals, in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) held that failure to file a timely objection to a Magistrate's Report and Recommendation foreclosed appeal to the Court of Appeals.  In *Thomas v. Arn*, 106 S. Ct. 466 (1985), the Supreme Court upheld that authority of the Court of Appeals to condition the right of appeal on the filing of timely objections to a Report and Recommendation.